The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 8, 2018

## 2018COA14

## No. 16CA1383, Danko v. Conyers — Torts — Professional Liability — Medical Malpractice — Pro Rata Liability

In this medical negligence case, the division considers the effect of the nonparty at fault statute, section 13-21-111.5, C.R.S. 2017, and Restatement (Second) of Torts section 457 (Am. Law Inst. 1965) (also called the original tortfeasor rule) on the admissibility of evidence offered by the initial provider that negligence of later providers caused the harm for which the patient sought damages from the initial provider. Rather than designating later providers as nonparties at fault, the initial provider sought to introduce evidence of their negligence as a superseding cause. The division first holds that the nonparty at fault statute does not preclude admission of such evidence. However, the division further holds that the trial court acted within its discretion in precluding the evidence because

the initial provider did not show that treatment by the later providers, even if negligent, was extraordinary, as required by the Restatement. Therefore, the judgment against the initial provider is affirmed. The division also holds that jury consulting fees can be recovered as costs under the settlement offer statute, section 13-17-202, C.R.S. 2017.

COLORADO COURT OF APPEALS                                   **2018COA14**

Court of Appeals No. 16CA1383
Boulder County District Court No. 14CV30542
Honorable Norma A. Sierra, Judge

Deborah Danko,

Plaintiff-Appellee and Cross-Appellant,

v.

David J. Conyers, M.D.,

Defendant-Appellant and Cross-Appellee.

JUDGMENT AFFIRMED, ORDER AFFIRMED IN PART,
REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE WEBB
Graham and Terry, JJ., concur

Announced February 8, 2018

Leventhal & Puga, P.C., Jim Leventhal, Erin C. Genullis, S. Paige Singleton,
Benjamin I. Sachs, Denver, Colorado, for Plaintiff-Appellee and Cross-Appellant

Jaudon & Avery LLP, David H. Yun, Denver, Colorado, for Defendant-Appellant
and Cross-Appellee

¶ 1    In a medical negligence case, should the initial provider be allowed to present evidence that a later provider's negligence caused the injury for which the patient seeks to recover damages from the initial provider?  Does the answer depend on whether the initial provider attempts to apportion fault or seeks complete exoneration because, even if he or she was negligent, the later provider's negligence was a superseding cause of the patient's injury?

¶ 2    David J. Conyers, M.D., who performed carpal tunnel surgery on Deborah Danko, appeals the judgment entered on a jury verdict in favor of Ms. Danko.  According to Ms. Danko, Dr. Conyers negligently failed to detect an infection resulting from the surgery, which led to amputation of her forearm.  Dr. Conyers challenges rulings before and during trial excluding his expert testimony that amputation of Ms. Danko's forearm by another physician, four months after she had been discharged from Dr. Conyers' care, was unnecessary.  Dr. Conyers raised the other physician's treatment not as a basis to apportion fault, but as a superseding cause that relieved him of any liability.  He also challenges jury instructions related to this issue.

¶ 3 Ms. Danko concedes preservation. She cross-appeals the trial court's refusal to award some costs that she incurred.

¶ 4 We conclude that because Dr. Conyers did not present evidence that the amputation was extraordinary, the trial court acted within its discretion in excluding evidence of the other provider's negligence. Rejecting Dr. Conyers' other contentions, we affirm the judgment. We reverse the cost award in part.

## I. Background and Procedural History

¶ 5 Dr. Conyers, a hand surgeon, performed carpal tunnel release surgery on Ms. Danko's right wrist on May 3, 2012. During post-operative care, he did not order a biopsy to detect possible infection. In October 2012, he released her from further care, believing that the wound was healing normally and was not infected.

¶ 6 A month later, Ms. Danko sought a second opinion from Dr. Frank Scott. Dr. Scott performed a minor procedure on Ms. Danko's wrist. Three weeks later, Dr. Scott was notified that cultures taken during the procedure had grown out acid-fast bacilli. Ms. Danko was diagnosed with a mycobacterium fortuitum (MBF) infection.

¶ 7    On January 16, 2013, Ms. Danko saw Dr. Carla Savelli, an infectious disease specialist.  Dr. Savelli recommended long-term dual therapy involving a regimen of several antibiotics and periodic surgical debridement of infected tissue.  Ms. Danko began taking antibiotics.

¶ 8    Two weeks later, Ms. Danko consulted Dr. Bennie Lindeque, an orthopedic surgeon.  Dr. Lindeque recommended amputation of Ms. Danko's forearm "due to the severity and level of tendon and nerve involvement."  He performed the amputation on February 11.

¶ 9    Ms. Danko sued Dr. Conyers, alleging that because he had failed to diagnose her MBF infection, he was responsible for the amputation.  Her retained experts opined that had Dr. Conyers ordered a biopsy in July or August, the MBF infection would have been detected, dual therapy could have begun, and amputation would not have been required.

¶ 10    Among other affirmative defenses in Dr. Conyers' answer, he raised nonparty at fault under section 13-21-111.5, C.R.S. 2017.  Dr. Conyers obtained an extension for designating nonparties.  Ultimately, he did not do so.

¶ 11 Before trial, Ms. Danko moved to strike the nonparty at fault defense and to preclude evidence of other providers' negligence or fault. The trial court granted the motion. After citing Restatement (Second) of Torts section 457 (Am. Law Inst. 1965) (hereinafter Restatement), CRE 401, 402, and 403, the court explained:

> In this Court's opinion, it would result in confusion to jurors were Dr. Conyers to be permitted to muddle the waters by calling into question the service rendered by subsequent doctors, where under [section 457 of] the Restatement of Torts, if the jury finds he was negligent, legally he would be the sole cause of Ms. Danko's losses.

¶ 12 During trial, the court adhered to this ruling. Still, the court allowed Dr. Conyers to present evidence as to the standard treatment of antibiotics and debridement for MBF infections, that Ms. Danko could have been treated this way even after she left Dr. Conyers' care, that she was improving under Dr. Savelli's treatment, that post-amputation photographs of the dissected limb showed healthy nerves and tendons, and that Dr. Conyers' care did not cause the amputation.

¶ 13 In depositions and at trial, both Dr. Conyers and his principal expert acknowledged that failing to diagnose and treat an MBF

4

infection earlier makes further medical treatment foreseeable. They conceded that an undiagnosed and untreated MBF infection can lead to amputation of the infected limb.

¶ 14    After Dr. Conyers rested, Ms. Danko moved for a directed verdict on causation and requested a nonpattern instruction on the original tortfeasor rule embodied in Restatement section 457. The trial court denied the motion. Over defense objection, the court gave the following nonpattern instruction:

> The plaintiff, Deborah Danko, is entitled to recover damages to the full extent of injuries and losses suffered as a result of the negligence, if any, of the defendant, Dr. Conyers, even if the injuries and losses she suffered may have been greater due to the course of medical care and treatment she received thereafter.

It also gave a standard instruction on causation.

¶ 15    The court rejected Dr. Conyers' tendered instructions on intervening cause. It also rejected a tendered instruction that Dr. Conyers would be liable for any additional bodily harm (e.g., amputation caused by subsequent health care providers), "provided that you also find that the additional bodily harm resulted from the normal efforts of health care providers in rendering aid which the

5

plaintiff's injury reasonably required, irrespective of whether such acts were done in a proper or negligent manner."

¶ 16     The jury found Dr. Conyers liable and awarded damages of $1.5 million.

### II.  The Trial Court Erred by Relying on Section 13-21-111.5 to Exclude Evidence That Other Providers Caused Ms. Danko's Injuries

¶ 17     The trial court held that "[b]y failing to designate the [other] providers as nonparties at fault, Dr. Conyers lost the right to argue that these providers caused Ms. Danko's injuries."  It explained that "[t]his ruling serves to exclude at trial any expert testimony concerning the standard of care related to the [other] providers."

¶ 18     The court based this part of its ruling on section 13-21-111.5(3)(b), which provides that the "[n]egligence or fault of a nonparty may be considered . . . if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action . . . ."  According to Ms. Danko, we must affirm the trial court's exclusion of evidence related to other providers' negligence or fault under this statute.

## A. Standard of Review

¶ 19 Questions of law concerning the application and construction of statutes are subject to de novo review. *City & Cty. of Denver Sch. Dist. No. 1 v. Denver Classroom Teachers Ass'n*, 2017 CO 30, ¶ 32.

## B. Analysis

¶ 20 Ms. Danko asserts that "Colorado law forbids the admission of evidence of a non-party's fault where that non-party was not properly designated." She relies on cases such as *Thompson v. Colorado & Eastern Railroad Co.*, 852 P.2d 1328, 1330 (Colo. App. 1993), where the division held that "a court may not allow the finder of fact to consider the negligence or fault of a nonparty unless such issue has properly been raised by the defendant in a pleading which complies with the requirements of [section] 13-21-111.5(3)."

¶ 21 But the supreme court has held that "a defendant may always attempt to interpose a complete defense that his acts or omissions were not the cause of the plaintiff's injuries." *Redden v. SCI Colo. Funeral Servs., Inc.*, 38 P.3d 75, 81 (Colo. 2001). In other words, "[a] defense that the defendant did not cause the plaintiff's injuries is not equivalent to the designation of a non-party because it cannot

result in apportionment of liability, but rather is a complete defense if successful." *Id.* (citing *Staley v. Bridgestone/Firestone, Inc.*, 106 F.3d 1504, 1512 (10th Cir. 1997)); *see Staley*, 106 F.3d at 1512 ("[Defendant] can only be held liable if its conduct was a contributing cause of the injury. It surely must be allowed to defend itself by showing someone else's action or inaction was the sole cause of the injury. That is different from apportionment between two parties both of whose fault contributed to the injury.").

¶ 22　　Dr. Conyers did not seek to apportion fault between him and the other providers. Instead, he sought to admit evidence that their care — not his — had caused Ms. Danko's amputation. Under *Redden,* such evidence is admissible even if a nonparty at fault has not been designated under section 13-21-111.5. Thus, this portion of the trial court's rationale was incorrect.

¶ 23　　Still, the trial court did not base its evidentiary ruling solely on section 13-21-111.5. *See URS Grp., Inc. v. Tetra Tech FW, Inc.,* 181 P.3d 380, 387 (Colo. App. 2008) ("[W]e must next consider whether the judgment may nevertheless be affirmed on one of the alternative grounds . . . ."); *cf. Foxley v. Foxley*, 939 P.2d 455, 458-59 (Colo. App. 1996) (appellant must challenge all of the trial court's

8

alternative bases for dismissal).  So, we turn to whether  excluding evidence related to the negligence or fault of other providers was proper under Restatement section 457, sometimes called the original tortfeasor rule.

### III.  The Trial Court Did Not Abuse Its Discretion by Relying on Restatement Section 457 to Exclude Evidence of Other Providers' Fault

¶ 24    The trial court found the following under CRE 401 and CRE 402:

> Even if Dr. Conyers can establish that [the] other . . . providers were negligent — an assumption made only for purposes of considering [Dr. Conyers' position] — the Restatement of Torts [section 457] would hold any injuries flowing from this subsequent care as being causally related to the care provided by Dr. Conyers.  Accordingly, the necessity of [the] decision to amputate the arm is irrelevant if it resulted from any negligence on the part of Dr. Conyers to not diagnose the infection.

### A.  Standard of Review

¶ 25    Dr. Conyers urges us to review this ruling de novo.  He argues that the trial court misinterpreted Restatement section 457 by disregarding an exception to initial physician liability and thus applied an incorrect legal standard, which raises a question of law.  *See Bd. of Cty. Comm'rs v. DPG Farms, LLC*, 2017 COA 83, ¶ 34

("Whether the court misapplied the law in making evidentiary rulings is reviewed de novo."). And if the court applied an incorrect legal standard, Dr. Conyers continues, the court abused its discretion. *Id.* ("An abuse of discretion occurs where the trial court's ruling . . . was based on a misunderstanding or misapplication of the law.").

¶ 26    But this argument must be juxtaposed against a trial court's broad discretion to admit or exclude evidence. *See Mullins v. Med. Lien Mgmt., Inc.*, 2013 COA 134, ¶ 35. Thus, while we review the court's application of Restatement section 457 de novo, unless it misunderstood this section, the decision to exclude the evidence remains within the court's discretion.

### B. Analysis

¶ 27    Colorado has adopted the approach set forth in Restatement section 457, which provides:

> If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, *irrespective of whether such acts are done in a proper or a negligent manner.*

(Emphasis added.) *See Redden*, 38 P.3d at 81 n.2 ("We recognize that Colorado case law does not absolve tortfeasors of liability when the plaintiff's injuries result from medical treatment reasonably sought and directly related to the actions of the original tortfeasor." (citing Restatement § 457)).

¶ 28 Under this approach,

> [i]f the actor knows that his negligence may result in harm sufficiently severe to require such services, he should also recognize this as a risk involved in the other's forced submission to such services, and having put the other in a position to require them, *the actor is responsible for any additional injury resulting from the other's exposure to this risk.*

Restatement § 457 cmt. b (emphasis added).

¶ 29 In successive medical malpractice cases, Restatement section 457 applies when a later "physician's treatment is directed toward mitigating the harm inflicted by the first." *Basanti v. Metcalf*, Civ. A. No. 11-cv-02765-PAB-NYW, 2015 WL 868758, at *27 n.50 (D. Colo. Feb. 26, 2015) (quoting *Daly v. United States*, 946 F.2d 1467, 1472 (9th Cir. 1991)). Under such circumstances, the initial physician is responsible "for the negligent manner in which a [subsequent] physician or surgeon treats the case or

11

diagnoses the injuries or performs an operation." Restatement § 457 cmt. c; *see Cramer v. Slater*, 204 P.3d 508, 514 (Idaho 2009) (Restatement section 457 "generally applies to any subsequent medical negligence which is necessary to correct an original act of medical negligence, thereby making acts of subsequent medical negligence generally foreseeable.").

¶ 30    Still, "[t]he relationship between the harm inflicted by the first physician and the treatment initiated by the second is crucial to holding the first physician liable for subsequent malpractice." *Daly*, 946 F.2d at 1471. For example, the *Daly* court declined to apply Restatement section 457 to the first physician where a patient "sought treatment from a second physician for an underlying ailment rather than for any harm inflicted by earlier treatment." *Id.* at 1472. Thus, under Restatement section 457, if the jury found Dr. Conyers negligent in failing to diagnose the MBF infection, and that the infection required further medical treatment, usually he would be responsible for the negligent manner in which a later provider treated the infection.

¶ 31    An exception exists, however, to the liability of initial physicians — they are "not answerable for harm caused by

12

misconduct which is extraordinary . . . ." Restatement § 457 cmt d. Simply put, such misconduct constitutes a superseding cause. *See Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 612 (Colo. App. 1998) ("[W]hen it appears to the court in retrospect that it is highly extraordinary that an intervening cause has come into operation, the court may declare such a force to be a superseding cause." (citing Restatement § 435)).

¶ 32    So, the question becomes this: crediting the evidence cited in Dr. Conyers' opposition, did the trial court misunderstand Restatement section 457 by failing to recognize that the amputation could have constituted such extraordinary misconduct?

¶ 33    Although Dr. Conyers argued for the exception, the trial court did not mention it. Instead, the court addressed only the role played by other providers' alleged negligence. For example, the court explained that "[e]ven if [Dr. Conyers] is able to establish that [other] providers were negligent in the services they rendered to Ms. Danko, this would not absolve [Dr. Conyers] of ultimate liability for [Ms. Danko's] losses." In saying this much, the court did not misunderstand Restatement section 457.

¶ 34    We are unwilling to equate the court's mere silence as to the exception with so fundamental a misunderstanding as Dr. Conyers asserts, especially in the face of his vigorous advocacy and citation of authority discussing the exception. *See People v. Harris*, 633 P.2d 1095, 1098 (Colo. App. 1981) ("Where, as here, the objecting party expressly raises the question of prejudice and the trial court nevertheless admits the evidence, it cannot reasonably be assumed that the court neglected to weigh that factor."); *cf. McGill v. DIA Airport Parking, LLC*, 2016 COA 165, ¶ 31 ("We acknowledge that it would have been helpful for the court to address CRE 403 in its written order. However, the fact that it did not do so does not compel the conclusion that it failed to conduct such an analysis at all."). Instead, we conclude that the court discussed only negligence because it had impliedly rejected Dr. Conyers' evidence to support the exception. *See, e.g., Janicek v. Obsideo, LLC*, 271 P.3d 1133, 1138 (Colo. App. 2011) ("While the trial court did not explicitly reject homeowners' contractual interpretation argument, such a finding was implicit in the court's ruling that homeowners were not entitled to claim a homestead exemption.").

¶ 35    So, having discerned no misunderstanding in the trial court's application of Restatement section 457, we take up the court's evidentiary discretion.

¶ 36    According to Dr. Conyers, the jury should have heard evidence related to the fault of the other providers because the facts were disputed as to whether their misconduct was extraordinary. He primarily relies on deposition testimony of his limb preservation expert, who testified that dual therapy cures ninety percent of patients like Ms. Danko. The expert continued that he was "shocked" by the amputation, which he said was "unnecessary" after less than two weeks of dual therapy.

¶ 37    But despite Dr. Conyers' assertion that the jury should have heard evidence about whether the amputation fell within the exception for extraordinary treatment, "[i]f the facts are undisputed, the court is duty-bound to apply the rules to determine the existence or extent of a negligent actor's conduct." *Weems v. Hy-Vee Food Stores, Inc.*, 526 N.W.2d 571, 574 (Iowa Ct. App. 1994). Put differently, does the record show a factual dispute sufficient to have allowed evidence of the other providers' fault? For the following three reasons, we conclude that the trial court

15

properly rejected Dr. Conyers' argument that whether the amputation was extraordinary was disputed.

¶ 38     First, an "unnecessary" amputation does not equate to extraordinary misconduct.  Indeed, Restatement section 457 gives the following example: "A's negligence causes B serious harm.  B is taken to a hospital.  The surgeon improperly diagnoses his case and performs an *unnecessary operation . . . .*  A's negligence is a legal cause of the additional harm which B sustains."  Restatement § 457 cmt. c, illus. 1 (emphasis added).

¶ 39     Second, although Dr. Conyers established that amputation under Ms. Danko's circumstances is rare, especially where dual therapy has just begun, both Dr. Conyers and his expert conceded amputation was a foreseeable risk of failure to diagnose — and hence delay in treating — an MBF infection.  *See Redden*, 38 P.3d at 81 ("An intervening cause only relieves the defendant of liability if it was not reasonably foreseeable.").  After all, the expert's opinion that ninety percent of patients are cured with dual therapy recognizes that ten percent are not.  *Compare Weems*, 526 N.W.2d at 574 (The court rejected the argument that medical treatment that resulted in a rare side effect was extraordinary, explaining, "[i]t is

16

immaterial in our analysis that the later injury in this case, spinal meningitis, was a rare side effect of the medical treatment. The important evidence was . . . that spinal meningitis was a known risk of the procedure."), *with Corbett v. Weisband,* 551 A.2d 1059, 1075 (Pa. Super. Ct. 1988) (Whether a physician's misconduct was extraordinary was a question for the jury where testimony showed the conduct of the physician was "grossly negligent," "border[ing] on insanity," and a thing that "no sane orthopedic surgeon would ever do.").

¶ 40 Third, Dr. Conyers did not present any expert testimony that the amputation constituted extraordinary misconduct, much less gross negligence. *See Bremer v. Gonzalez,* No. 2 CA-CV 2011-0064, 2011 WL 6886073, at *5 (Ariz. Ct. App. Dec. 29, 2011) (unpublished opinion) ("Du-Brook contends, 'this case involved unforeseeable and extraordinary events,' but identifies no extraordinarily negligent act or omission by Gary's treating physician. It merely notes Bremer had alleged the physician fell below the applicable standard of care. This is insufficient to support a finding of a superseding cause as a matter of law."). As in *Bremer,* Dr. Conyers' experts only opined that "substandard medical care" led to the amputation.

17

¶ 41    Under these circumstances, the trial court acted within its discretion in excluding evidence of the other providers' fault because Dr. Conyers had not presented any evidence sufficient to invoke the extraordinary misconduct exception.

¶ 42    Yet, perhaps recognizing that the question was close, the trial court went further and provided another reason for excluding the evidence.  The order explained that even if admissible under CRE 401 and 402, the evidence should be excluded under CRE 403.  We address this reason next.

### IV.  The Trial Court Acted Within Its Discretion in Excluding Evidence of Other Providers' Fault Under CRE 403

¶ 43    The trial court gave two reasons for excluding any evidence that other providers' fault had caused Ms. Danko's amputation under CRE 403.

¶ 44    First, the court explained that allowing such evidence "would result in confusion to jurors" if Dr. Conyers was "permitted to muddle the waters by calling into question the service rendered by subsequent doctors, where under the Restatement of Torts [section 457], if the jury finds he was negligent, legally he would be the sole cause of Ms. Danko's losses."

18

¶ 45    Second, the court noted that "[Ms. Danko's] counsel also advised . . . as to his concerns that permitting [Dr. Conyers] to present testimony questioning the decisions of [other] providers would result in a 'trial within a trial,' potentially exceeding the 14-day period set forth for this proceeding."

## A.  Standard of Review

¶ 46    A trial court has broad discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay [or] waste of time . . . ."  CRE 403; *see Alhilo v. Kliem*, 2016 COA 142, ¶ 9.

## B.  Analysis

¶ 47    Restatement section 457 supports the trial court's concern over jury confusion.  If the jury found Dr. Conyers negligent, then it would have to decide whether the other providers' alleged "substandard care" rose to the level of extraordinary misconduct.  And herein lies the problem: what constitutes extraordinary misconduct is not so easily defined.  *Compare Carmichael v. Beller*, 914 P.2d 1051, 1058-59 (Okla. 1996) (Extraordinary medical treatment is "something which may not have been within a normal

effort to render aid . . . for the injuries suffered."), *with Deutsch v. Shein*, 597 S.W.2d 141, 145 (Ky. 1980) (if a "divergence of medical opinion" exists about the misconduct, it is not extraordinary), *abrogated on other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012).

¶ 48     Restatement section 457 provides two illustrations of extraordinary misconduct relieving the original tortfeasor of liability for the subsequent misconduct:

- A nurse, unable to bear the sight of the victim's intense suffering, disobeys the surgeon's instructions and gives an injection of morphine so excessive she knows it might be lethal.  Restatement § 457 cmt. d, illus. 4.

- The victim takes advantage of a hospital stay to have an unrelated procedure performed, e.g., the victim's initial injury is a broken leg, but examination reveals an unrelated hernia for which surgery is negligently performed.  Restatement § 457 cmt. e, illus. 6.

Neither of these scenarios would have been useful in instructing the jury here.

¶ 49    Instead, the court would have had to draw finer lines than the jury might have understood between inadmissible testimony that the other providers' treatment fell below the standard of care and admissible testimony that their treatment fell so far below that standard as to be extraordinary. *Compare Williams v. Le*, 662 S.E.2d 73, 77 (Va. 2008) ("In order to relieve [the physician] of liability for his negligent act, the negligence intervening between the [physician's] negligent act and the injury must so entirely supersede the operation of the [physician's] negligence that it alone, without any contributing negligence by the [physician] in the slightest degree, causes the injury." (quoting *Atkinson v. Scheer*, 508 S.E.2d 68, 71 (1988))), *with Puckett v. Mt. Carmel Reg'l Med. Ctr.*, 228 P.3d 1048, 1069 (Kan. 2010) ("[W]hether the aspiration resulted from negligence or not, it was a foreseeable consequence of the treatment alleged to have been necessitated by [the medical providers'] alleged negligence. Thus . . . this case is not one of extraordinary circumstances . . . .").

¶ 50    As well, allowing evidence of the other providers' fault would create a trial within a trial. Ms. Danko sought to blame Dr. Conyers. If he, in turn, sought to blame the other providers, juror

confusion could result. *See Hopey v. Spear*, No. 13-CV-2220, 2016 WL 9665165, at *6 (C.D. Ill. June 23, 2016) ("Such questioning, if not reasonably and carefully limited by the court, has the potential to turn into a 'trial within a trial,' and prejudice and confuse the jury as to what is the relevant, actual issue in this case . . . ."). In other words, allowing evidence of the other providers' fault could have shifted the jury's focus from Dr. Conyers' care of Ms. Danko to the other providers' care. *See Manuel v. City of Chicago*, 335 F.3d 592, 597 (7th Cir. 2003) ("If that evidence had been admitted by the district court, the parties would have no doubt argued over the truthfulness of those allegations, necessarily shifting the focus of the trial . . . .").

¶ 51 Given all this, we conclude that the court acted within its discretion in excluding this evidence, under both Restatement section 457 and CRE 403.

## V. Jury Instructions

¶ 52 Lastly, Dr. Conyers challenges the trial court's jury instructions related to the other providers' fault. Specifically, the court gave a midtrial instruction that the "necessity of Ms. Danko's amputation . . . is not a matter that you will be asked to deliberate

upon." And at the end of the trial, the court gave Ms. Danko's tendered nonpattern instruction saying that she was entitled to damages for the full extent of injuries, "even if the injuries and losses she suffered may have been greater due to the course of medical care and treatment she received thereafter."

¶ 53     Dr. Conyers also challenges the trial court's rejection of his jury instruction on Restatement section 457 and his intervening cause instruction.

## A. Standard of Review

¶ 54     We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law. *Nibert v. Geico Cas. Co.*, 2017 COA 23, ¶ 8. If they did, we review the trial court's decision to give or reject a particular jury instruction for an abuse of discretion. *Id.*

## B. Analysis

¶ 55     Dr. Conyers argues that the instructions given by the trial court misstated the law and instead emphasized Ms. Danko's theory of causation. These arguments fall short.

¶ 56     As to the midtrial instruction, Dr. Conyers' liability for damages resulting from the amputation did not depend on whether

23

it was necessary.  *See Carter v. Shirley*, 488 N.E.2d 16, 20 (Mass. App. Ct. 1986) ("We see no reason why the rule should not apply to physicians whose original negligence causes the intervention of a second physician who either improperly diagnoses the case and performs an unnecessary operation or makes a proper diagnosis and performs a necessary operation negligently."); *see also* Restatement § 457 cmt. c.  Thus, telling the jury it would not deliberate on the necessity of the amputation was within the court's discretion.

¶ 57    As to the nonpattern jury instruction, recall that the trial court excluded evidence of the other providers' fault.  For this reason, the instruction accurately described Dr. Conyers' liability under Restatement section 457, if the jury found that he had caused Ms. Danko's injury by having failed to diagnose and treat the MBF infection.

¶ 58    Still persisting, Dr. Conyers argues that the nonpattern instruction should have told the jury that the amputation must have resulted "from the normal efforts of third persons in rendering aid which the other's injury reasonably requires."  To be sure, this language appears in Restatement section 457 and it was accurately

quoted in Dr. Conyers' tendered instruction. But his argument misapprehends both "normal" and "reasonably requires."

¶ 59    Restatement section 457 neither defines "normal" nor offers an illustrative example. However, comment b to Restatement section 443 explains as follows:

> The word "normal" is not used in this Section in the sense of what is usual, customary, foreseeable, or to be expected. It denotes rather the antithesis of abnormal, of extraordinary. It means that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside of the class of normal events. When a negligently driven automobile hits a cow, it is scarcely to be regarded as usual, customary, or foreseeable in the ordinary sense in which that word is used in negligence cases, that the cow, after lying stunned in the highway for five minutes, will recover, take fright, and make a frantic effort to escape, and that in the course of that effort it will charge into a bystander, knock him down, and injure him. But in retrospect, after the event, this is not at all an abnormal consequence of the situation which the driver has created. It is to be classified as normal, and it will not operate as a superseding cause which relieves the driver of liability.

Viewed through this lens, "normal" remains subject to the prior analysis of "extraordinary."

25

¶ 60    Nor must the amputation have been "reasonably required." *See Whitaker v. Kruse*, 495 N.E.2d 223, 225-26 (Ind. Ct. App. 1986) ("The rationale for permitting recovery under this rule is that the tort-feasor created the necessity for medical care in the first instance.  So long as the individual seeking medical care makes a reasonable choice of physicians, he is entitled to recover for all damages resulting from any aggravation of his original injury caused by a physician's misdiagnosis or mistreatment."); *Rine v. Irisari*, 420 S.E.2d 541, 545 (W. Va. 1992) ("[T]he aggravation caused by the negligent or unskillful treatment by a physician of the original injury would not have occurred if there had been no original injury." (quoting *Makarenko v. Scott*, 55 S.E.2d 88, 93-94 (W. Va. 1949))).

¶ 61    Instead, the phrase "reasonably required" refers to whether Ms. Danko was reasonable in seeking medical treatment for the MBF infection and whether that treatment related to an injury caused by Dr. Conyers.  *See Redden*, 38 P.3d at 81 n.2; *Madrid v. Safeway Stores, Inc.*, 709 P.2d 950, 951 (Colo. App. 1985) ("Although Madrid's experts testified that the initial surgery was reasonably required, and was necessitated as a result of the injury

26

to her toe sustained in the fall, the evidence on this issue was in conflict. Safeway produced testimony by four medical doctors that the original injury was minor and did not require surgery.").

¶ 62    The evidence was undisputed that Ms. Danko reasonably sought medical treatment related to the MBF infection. Dr. Conyers did not argue that further treatment was unnecessary — only that he did not cause the MBF infection needing treatment. On this basis, the issue faced by the jury was whether Dr. Conyers caused Ms. Danko to seek treatment because he was negligent in neither diagnosing nor treating the MBF infection. *See Rine*, 420 S.E.2d at 544 ("Many courts have recognized the rule that, in cases of successive malpractice, the original medical tortfeasor is liable for subsequent negligent medical treatment which is undertaken to mitigate the harm caused by the original medical tortfeasor."). Dr. Conyers' tendered instruction misstated this principle.

¶ 63    Turning to the intervening cause instruction requested by Dr. Conyers, we conclude that the trial court properly rejected it as well. First, as discussed in Part III above, the court acted within its discretion in holding that Dr. Conyers' opposition and his midtrial proffer did not include evidence creating a dispute whether the

27

amputation resulted from extraordinary misconduct. Second, treatment by subsequent providers that merely falls below the standard of care does not constitute superseding cause. *See Weems*, 526 N.W.2d at 574 ("[T]he trial court correctly rejected [the defendant's] requested jury instruction on superseding cause" where "[t]he undisputed evidence revealed that medical treatment rendered to Weems was not an extraordinary or unforeseeable act.").

¶ 64     In sum, we conclude that the jury was properly instructed.

## VI.  Ms. Danko's Cross-Appeal

¶ 65     On cross-appeal, Ms. Danko challenges the trial court's denial of costs totaling $47,530.75.  Dr. Conyers does not dispute preservation.  We affirm in part and reverse in part.

## A.  Additional Background

¶ 66     On October 21, 2015, Ms. Danko made a settlement offer under section 13-17-202(1)(a)(I), C.R.S. 2017.  Dr. Conyers did not accept the offer.  The verdict exceeded the amount of the offer.

¶ 67     The trial court reduced the recoverable costs below amounts paid by Ms. Danko in four areas.  As to Dr. Lindeque, who testified for Ms. Danko as a nonretained treating physician — although Ms.

28

Danko had initially endorsed him as a retained expert — the court reduced costs from $45,000 to $15,000. The court reduced the costs for ReEntry Rehabilitation Services, which prepared a post-amputation life care plan, from $15,434.60 to $10,280.73. It disallowed entirely Ms. Danko's claim for court reporter fees and transcript costs totaling $2125.75, all of which involved depositions of her treating physicians taken by Dr. Conyers. The court also disallowed $7944.14 claimed for a jury consultant and related travel expenses.

## B. Standard of Review and Law

¶ 68 Awarding costs is within the discretion of the trial court, and the court's findings as to the reasonableness and amount of costs will be disturbed on appeal only for an abuse of discretion. *Archer v. Farmer Bros. Co.*, 90 P.3d 228, 230 (Colo. 2004). A trial court abuses its discretion when it acts in a manifestly arbitrary, unfair, or unreasonable manner. *Id.*

¶ 69 According to section 13-17-202(1)(a)(I),

> [i]f the plaintiff serves an offer of settlement in writing at any time more than fourteen days before the commencement of the trial that is rejected by the defendant, and the plaintiff recovers a final judgment in excess of the

amount offered, then the plaintiff shall be awarded actual costs accruing after the offer of settlement to be paid by the defendant.

¶ 70    However, merely by making a statutory settlement offer, a party cannot "compel a trial court to award actual costs no matter how unreasonable or unnecessary such expenses may have been. This would lead to the untenable result that a trial court awards costs for expenses which never should have been incurred." *Scholz v. Metro. Pathologists, P.C.*, 851 P.2d 901, 910 (Colo. 1993). Rather, in considering whether to award such costs,

> [t]he trial court has no discretion to deny an award of actual costs under this statute, so long as it determines that those costs are reasonable. Nonetheless, the trial court holds discretion over the amount of costs to be awarded and may disallow certain requested costs as unreasonable so long as the court includes in the record its reasons for doing so.

*Bennett v. Hickman*, 992 P.2d 670, 673 (Colo. App. 1999), *superseded by statute on other grounds*, Ch. 5, sec. 1, § 13-17-202, 2008 Colo. Sess. Laws 8, *as recognized in Miller v. Hancock*, 2017 COA 141.

¶ 71    The proper exercise of this discretion requires the trial court to answer two questions:

> 1. Were the expert's services reasonably necessary to the party's case?
>
> 2. Did the party expend a reasonable amount for the expert's services?

*Clayton v. Snow*, 131 P.3d 1202, 1203 (Colo. App. 2006) (citations omitted). The answers to these questions may lead to reduction in the amount of costs awarded. *See, e.g., Underwood v. Dillon Cos.*, 936 P.2d 612, 616 (Colo. App. 1997) ("On cross-appeal, King Soopers claims that the trial court abused its discretion in awarding only half of its requested amount of expert witness fees. We disagree.").

¶ 72    "A trial court's award of costs must be supported by findings that, considered together with the record, are sufficient to permit a reviewing court to determine the basis for the award." *Miller*, ¶ 46. Specifically, the findings "must include an explanation of whether and which costs are deemed reasonable." *Id.*

### C. Application

¶ 73    Dr. Conyers argues that the trial court properly exercised its discretion because Ms. Danko incurred some of the reduced costs before the statutory settlement offer. This argument falls short because the court made no findings on timing. Instead, it

31

articulated other reasons for reducing the costs claimed, which we address.

### 1. Dr. Lindeque

¶ 74    The trial court found:

> The invoices submitted by Dr. Lindeque do not differentiate between the time he spent in an expert capacity versus that spent as a treating physician. In researching medical literature, Dr. Lindeque billed 69.5 hours. At trial, the Court was struck by Dr. Lindeque's testimony about the time spent preparing for trial relative to the period of time he spent treating Ms. Danko. His time treating Ms. Danko was very limited, especially when considering the significance of the procedure [he] performed. By contrast, the time he spent preparing for trial exceeded his time with Ms. Danko by more than tenfold. The Court finds that awarding $15,000 for Dr. Lindeque's preparation and participation at trial is reasonable under the circumstances of this case.

Ms. Danko does not assert that these findings lack record support. And the findings explain why the court reduced these costs.

¶ 75    Undaunted, Ms. Danko argues that the court should have allowed the entire $45,000 charge because Dr. Lindeque testified "in good faith," he "professionally and diligently performed" his

underlying work, and the court did not find his $500 hourly rate unreasonable. This argument misses the mark in two ways.

¶ 76     First, Ms. Danko reduces the initial *Clayton* question — "Were the expert's services reasonably necessary to the party's case?" — to a binary choice. But doing so would deprive trial courts of discretion to determine that some, but not all, of an expert's services were reasonably necessary. *See Underwood,* 936 P.2d at 616.

¶ 77     Second, at trial Dr. Lindeque did not testify for Ms. Danko as a retained expert. And as discussed above, the court precluded all evidence that the amputation was unnecessary. Given these limitations, the court concluded that his charges were excessive, without impugning Dr. Lindeque's good faith, questioning his professionalism, or commenting on his credibility. *Cf. In re Marriage of Elmer,* 936 P.2d 617 (Colo. App. 1997) (finding half of fee reasonable in light of charges that trial testimony by expert witness was duplicative and $14,470 in requested costs was excessive).

¶ 78     On this basis, we discern no abuse of discretion.

## 2. ReEntry Rehabilitation

¶ 79    The trial court found:

> Plaintiff seeks $15,434.60 for ReEntry
> Rehabilitation Services.  Helen Woodard
> assessed Ms. Danko's vocational
> rehabilitation.  The report completed, and for
> which billing is included, also includes review
> of depositions and review of medical records,
> which are believed to have little relevance to
> the development of a post-amputation Life
> Care Plan.  This information is then
> summarized in 12 pages of a 37-page report.
> The Court finds that approximately two-thirds
> of the amount requested for Ms. Woodard, or
> $10,280.73, is reasonable to award as costs.
> The $400 cost for setting up the file is
> regarded as necessary and reasonable.

Again, Ms. Danko does not assert that these findings lack record support.

¶ 80    Instead, she argues that when the trial court concluded approximately one third of the report had "little relevance" to the care plan, the court made an improper credibility determination. But the court did not mention credibility.  Nor does Ms. Danko explain why the deposition and record review were reasonable and necessary to develop the life care plan.

¶ 81    Of course, the court's one-third reduction of the costs claimed was an approximation based on the portion of the report the court

34

questioned.  But "[t]he trial court's goal when awarding attorney fees and costs 'is to do rough justice, not to achieve auditing perfection.'"  *Estate of Casper v. Guarantee Tr. Life Ins. Co.*, 2016 COA 167, ¶ 70 (citation omitted) (*cert. granted* June 26, 2017).

¶ 82    For these reasons, we cannot say the trial court abused its discretion in reducing the ReEntry Rehabilitation costs.

### 3.  Court Reporter Fees and Transcripts

¶ 83    The trial court found:

> An objection is also presented for the deposition fees totaling $2,125.75 for a number of Plaintiff's treating physicians, as these were taken when Plaintiff objected to informal discovery by Defendant.  The Court agrees that Plaintiff could have cooperated with Defendant's approach on this point, and this amount of $2,125.75 is disallowed from Plaintiff's bill of costs.

Here, too, Ms. Danko does not assert that these findings lack record support.

¶ 84    Rather, she asserts that "[r]egardless of the precipitating factors for Defendant's decision to take depositions of Plaintiff's treating physicians," the record does not show that the related "transcription and reporter fees actually expended were unreasonable."  But this assertion begs the question of whether, as

35

the court found, Ms. Danko could have avoided these costs. After all, to recover deposition costs, a party must show "the taking of the deposition and its general content were reasonably necessary." *Cherry Creek Sch. Dist. No. 5 v. Voelker*, 859 P.2d 805, 813 (Colo. 1993).

¶ 85    Thus, the findings support the discretionary decision to disallow these costs.

### 4.  Jury Consulting

¶ 86    The trial court found:

> Defendant objects to an expense of $6,474.57 for a jury consultant, plus travel expenses of $1,469.57 for travel on short notice.  The Court agrees with Defendant that these two expenses are unnecessary to Plaintiff's counsel [sic] presentation of the case to a jury, and are disallowed.

Unlike the three other findings discussed, this finding does not involve any factual questions resolvable by record examination.

¶ 87    The parties have not cited, nor have we found, Colorado authority addressing jury consulting expenses as recoverable costs. Dr. Conyers cites several unpublished decisions from the United States District Court for the District of Colorado.  Ms. Danko responds that federal law defines recoverable costs more narrowly

than does Colorado law, citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987).  She is correct.

¶ 88  Although section 13-17-202(1)(b) does not mention jury consulting expenses, use of "including" in the statute "means that the items of 'actual costs' listed are illustrative rather than exhaustive."  *Catlin v. Tormey Bewley Corp.*, 219 P.3d 407, 416 (Colo. App. 2009).

¶ 89  On the one hand, authority in other states is sparse.  Citing federal precedent, one state has held that such expenses are not recoverable as costs.  *Delmonico v. Crespo*, 127 So. 3d 576, 579 (Fla. Dist. Ct. App. 2012) ("We agree with other jurisdictions which have held that costs and fees associated with jury consultants are not recoverable."); *see also City of Shreveport v. Chanse Gas Corp.*, 794 So. 2d 962, 979 (La. Ct. App. 2001) ("Here, the District Court viewed the mock trial and jury consultant as overhead items which cannot be reimbursed.  Given that these exercises were strictly to aid the attorneys and yielded only marginal results, we cannot say the District Court abused its great discretion in denying these items as costs.").

¶ 90    On the other hand, we recognize that "[r]ising costs of increasingly specialized lawyers, the need to deploy expensive experts, jury consultants, and all the associated expenses have priced some parties out of the market."  Marc Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. Empirical Legal Stud. 459, 517 (2004) (footnote omitted), *cited with approval in State ex rel. Crown Power & Equip. Co. v. Ravens*, 309 S.W.3d 798, 804 (Mo. 2009).

¶ 91    Balancing this limited authority against the concern over rising litigation expenses leads to considering the policy underlying our settlement offer statute.  "The intent of section 13-17-202 is to encourage settlements by imposing costs upon a rejecting party in the event the final result is less favorable to that party than the offer."  *Hall v. Frankel*, 190 P.3d 852, 866 (Colo. App. 2008).  In other words, "[t]he purpose of section 13-17-202 is to encourage the settlement of litigation by increasing the cost of proceeding with a lawsuit after the opposing party has made a reasonable settlement offer."  *Lawry v. Palm*, 192 P.3d 550, 565 (Colo. App. 2008).

¶ 92    These statements of purpose and intent tip the scales in favor of recovery of jury consulting expenses by a party who made a

statutory settlement offer, which was rejected, and did better than the offer at trial.

¶ 93 Nor would allowing Ms. Danko to recover the jury consulting expenses contravene the trial court's discretion over reasonableness. Recall, the court did not find these expenses unreasonable, in whole or in part. Rather, the court found them "unnecessary to Plaintiff's counsel [sic] presentation of the case to a jury."

¶ 94 But the statute does not impose a necessity requirement on recovery of "actual costs accruing after the offer." And while reasonableness has been implied as a precondition to recovery, reasonableness is a lower standard than necessity. Thus, the court's finding of "unnecessary" does not support disallowing this cost.

¶ 95 In sum, the trial court's cost award is reversed as to the $7944.14 jury consulting and related travel expenses. In all other respects, the award is affirmed.

## VII. Conclusion

¶ 96     The judgment is affirmed.  The trial court's cost award is affirmed in part and reversed in part.  On remand, the trial court shall increase the costs awarded to Ms. Danko by $7944.14.

JUDGE GRAHAM and JUDGE TERRY concur.